**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**LESLIE W. KELLY**
**3403 Wood Creek Drive**
**Suitland, Maryland 20746**

**Plaintiff,**

**v.**

**Civil Action No:________________**
**JURY TRIAL DEMANDED**

**METROPOLITAN WASHINGTON**
**AIRPORTS AUTHORITY**
**1 Aviation Circle**
**Washington, D.C. 20001**

**and**

**COA VIRGINIA, INC.**
**4312 Evergreen Lane, Suite A**
**Annandale, Virginia 22003**

**Defendants.**

---

## COMPLAINT

COME NOW, Plaintiff Leslie W. Kelly, by and through undersigned counsel, and for her Complaint against Defendants Metropolitan Washington Airports Authority ("MWAA") and COA Virginia, Inc. ("Cleaners of America"), states as follows:

## JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) because this action is between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2. Plaintiff is a citizen of Maryland, and no Defendant is a citizen of Maryland.

3. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because MWAA maintains its principal office in the District of Columbia and Defendants reside in this District

for venue purposes.

4. This Court has personal jurisdiction over MWAA because it maintains its principal office in the District of Columbia.

5. This Court has personal jurisdiction over Cleaners of America because it transacts business in the District of Columbia and contracts with MWAA, which is headquartered here, to clean the airport terminal where Plaintiff is injured.

## PARTIES

6. Plaintiff Leslie W. Kelly is an adult who lives in Suitland, Prince George's County, Maryland.

7. Defendant MWAA is a public body corporate and politic, created by interstate compact between the Commonwealth of Virginia and the District of Columbia with the consent of Congress, that owns, operates, and controls Ronald Reagan Washington National Airport ("Reagan National") and may sue and be sued.

8. Defendant COA Virginia, Inc. is a corporation, doing business as Cleaners of America, with its principal place of business in Annandale, Virginia, that provides janitorial and floor-care services inside the Reagan National terminal under contract with MWAA.

## FACTUAL BACKGROUND

9. It is the early morning of Tuesday, November 5, 2024, before sunrise, at Reagan National.

10. Leslie Kelly, 69 years old, is on her way to work.

11. She is a customer service agent for American Airlines, and travelers count on her to get them where they are going.

12. She steps off the parking shuttle and walks into the terminal on the baggage-claim level, near Door 8.

13. She turns left toward the elevator that will take her to her shift.




*Figure 1. The baggage-claim level of the Reagan National terminal; the circle marks the area near Door 8 and the elevator where Mrs. Kelly falls.*

14. MWAA owns Reagan National and controls everything inside its terminal, including its floors.

15. MWAA does not clean those floors with its own hands.

16. MWAA hires Cleaners of America to do it for them.

17. On November 5, 2024, Cleaners of America is in control of cleaning the terminal floor where members of the public walk.

18. MWAA and Cleaners of America's job is to patrol the floors, find every spill, and clean it up immediately.

19. When a floor is wet, the Defendants' job is to put out wet-floor signs, cones, or barricades right away and leave them standing until the floor is completely dry.

20. That is how a busy airport keeps airline staff and members of the public safe while walking to their destination within the airport.

21. When the Defendants do their job, the morning goes like this.

22. The Defendants see wetness on the tile walkway near the elevator.

23. The Defendants set a bright yellow wet-floor sign beside it before doing anything else.

24. The Defendants mop the wetness up and dry the tile.

25. If the floor is still damp, the Defendants leave the sign standing or block off the walkway.

26. Airline employees and members of the public see the sign, step around the wet tile, and continue to their destination within the airport or leave the airport unharmed.

27. Or, in this case, Mrs. Kelly, arrives to her work post, works her shift, and later goes home to her husband on two good legs.

28. That is not what happens.

29. Upon information and belief, the Defendants are aware of conditions that cause wetness to accumulate in the area in which Mrs. Kelly will soon walk.

30. Upon information and belief, prior to Mrs. Kelly's arrival, the Defendants observe wetness in the area in which Mrs. Kelly will soon walk.

31. The Defendants leave the wetness on the tiled walkway in the path to the elevator.

32. The Defendants do not put wet-floor signs beside the fluid.

33. The Defendants do not put out any cones, mats, or barricades to block or warn about the hazard.

34. The Defendants do not dry the floor.

35. The Defendants do not close the walkway.

36. The Defendants do not warn Mrs. Kelly or anyone else walking to the elevator.

37. MWAA, which controls the terminal and its cleaning contract, does nothing to make sure its contractor keeps that walkway dry or marked.

38. The wetness is clear on a shiny tile floor, and a person walking toward the elevator cannot see it.

39. Mrs. Kelly's left foot lands in the wetness and shoots out from under her.

40. Her legs split apart, and her full weight drives her left knee into violent, unnatural bending.

41. The force tears her patellar tendon off the bottom of her kneecap.

42. It snaps off the lower tip of her kneecap with it.

43. The broken piece of bone and the torn tendon pull away from the rest of the kneecap by about an inch.

44. In that instant, the muscles that straighten Mrs. Kelly's leg are no longer connected to it.

45. Mrs. Kelly screams.

46. Co-workers who had walked ahead of her turn back to help.

47. The Defendants have every chance to prevent this.

48. They can put a wet-floor sign beside the wetness.

49. They can set out cones.

50. They can lay down a mat.

51. They can mop and dry the tile before moving on.

52. They can rope off the walkway until the floor is dry.

53. They can tell the people walking toward the elevator to go around.

54. They do none of these things.

55. Instead, the Defendants leave the wetness on the floor and the walkway open.

56. MWAA's airport emergency team arrives, lifts Mrs. Kelly into a wheelchair, and puts her in an ambulance.

57. The ambulance takes her to Inova Alexandria Hospital.

58. Mrs. Kelly tells the emergency physician that she slipped on water.

59. A CT scan shows an acute avulsion fracture at the bottom of her left kneecap, with the broken fragment pulled about 2.5 centimeters away.

60. The hospital sends her home in a knee immobilizer with a walker.

61. Mrs. Kelly did nothing to cause this fall.

62. She is walking normally, on her way to her job.

63. She never sees the wetness coming.

64. She has no control over the terminal floor, its cleaning, or its warnings.

65. Six days later, her orthopedic surgeon, Dr. Nigel Azer, finds that she cannot lift her left leg straight off the table.

66. He can feel the gap at the bottom of her kneecap with his fingers.

67. Her patellar tendon and the mechanism that straightens her knee no longer work.

68. On November 14, 2024, Dr. Azer operates on Mrs. Kelly's left knee.

69. He opens her knee, removes the broken lower part of her kneecap, and rebuilds the patellar tendon by attaching it back to what is left of the bone.

70. Mrs. Kelly leaves surgery with a long incision held closed by staples.

71. For weeks after surgery, her leg stays locked straight in a hinged brace.

72. With her leg locked straight, she cannot bend her knee to sit in a chair, climb a stair, or get into a car.

73. She moves from a wheelchair to a walker, and from a walker to a cane.

74. She goes through months of physical therapy to learn to use her left leg again.

75. Months after surgery, she still walks slowly with a cane, and her left knee still gives way under her.

76. She still cannot bend her left knee much past a right angle.

77. She is left with a thick, raised scar down the front of her knee.

78. Her doctor keeps her out of work for months and then limits her to sitting work, standing no more than 15 minutes at a time.

79. Mrs. Kelly has not gone back to her job helping travelers at the airport.

80. Before this fall, Mrs. Kelly lives and works with arthritis in her left knee.

81. Before this fall, she can walk up two flights of stairs and does her job on her feet.

82. The fall makes her left knee far worse.

83. The torn tendon and the missing piece of kneecap push off the knee replacement Mrs. Kelly will need.

84. Her surgeon expects the tendon injury to complicate that replacement, lengthen her recovery from it, and raise the risk that the mechanism that straightens her leg fails again.

85. As a result of Defendants' negligence, Mrs. Kelly has suffered and will continue to suffer serious and permanent injury to her left knee, physical pain, emotional distress, scarring and disfigurement, inconvenience, and the loss of the life she lived before.

86. As a result of Defendants' negligence, Mrs. Kelly has incurred more than $30,000 in medical expenses and will incur more, including the cost of a more complicated knee replacement.

87. As a result of Defendants' negligence, Mrs. Kelly has lost earnings and earning capacity.

## COUNT I – NEGLIGENCE

### (Against MWAA and Cleaners of America)

88. Plaintiff incorporates paragraphs 1 through 87 as if fully set forth here.

89. Mrs. Kelly is lawfully inside the Reagan National terminal, on her way to work, as an invitee.

90. MWAA owes Mrs. Kelly a duty to use reasonable care to keep the terminal floors reasonably safe, to inspect them at reasonable intervals, and to warn of dangerous conditions that it knows or should know about.

91. MWAA breaches that duty by allowing standing wetness to remain on a main walkway, failing to inspect, failing to warn, failing to require and confirm that wet floors are marked and dried, and failing to supervise the contractor it hired to keep the floors safe.

92. Cleaners of America undertake to clean, patrol, and maintain the terminal floors where Mrs. Kelly walks, and it owes everyone walking on them, including Mrs. Kelly, a duty to perform that work with reasonable care.

93. The Defendants breach that duty by leaving standing wetness on the walkway, failing to clean it up and dry the floor, failing to post wet-floor signs, cones, or barricades, failing to close the walkway, and failing to warn Mrs. Kelly.

94. Upon information and belief, the Cleaners of America worker cleaning the walkway acts within the course and scope of employment with Cleaners of America and MWAA.

95. MWAA and Cleaners of America are responsible under the doctrine of respondeat superior for the negligence of its contractors and employees, and Mrs. Kelly seeks a single recovery for that conduct.

96. In addition to and in the alternative to its vicarious liability, Cleaners of America is directly negligent in hiring, training, staffing, and supervising its workers and in failing to enforce its own wet-floor procedures.

97. Upon information and belief, Cleaners of America cleans the terminal as MWAA's agent, and MWAA is responsible for its agent's negligence in keeping MWAA's floors safe for invitees.

98. In addition to and in the alternative to that responsibility, MWAA is directly negligent as set out above.

99. Defendants' negligence is a direct and proximate cause of Mrs. Kelly's injuries and damages.

100. Mrs. Kelly is not negligent and does not assume any risk.

**WHEREFORE**, Plaintiff Leslie W. Kelly respectfully requests that this Court enter judgment in her favor and against Defendants Metropolitan Washington Airports Authority and COA Virginia, Inc., and award:

A. Compensatory damages in an amount to be proven at trial, in excess of $500,000;

B. Pre-judgment and post-judgment interest;

C. The costs of this action; and

D. Such other and further relief as the Court deems just.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

BOND LAW, PLLC

/s/ Johnnie D. Bond, Jr.
Johnnie D. Bond, Jr. (Bar# 485488)
3221 M Street, NW
Washington, DC 20007
Telephone: (202) 683-6803
Facsimile: (202) 979-8434
jbond@bondpllc.com
*Attorneys for Plaintiff*